## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                  No. CR 03-2365 JB

DANIEL SHADOWHAWK FOGHORN,

        Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion for Judgment of Acquittal, filed August 22, 2005 (Doc. 210)("Motion for Acquittal"). The Court held a hearing on this motion on January 9, 2006. The primary issues are: (i) whether, at trial, the United States presented sufficient evidence for the jury to find Defendant Daniel Foghorn guilty of second-degree murder and kidnaping resulting in death beyond a reasonable doubt; and (ii) whether Foghorn has raised an issue of juror prejudice that impeaches the jury's verdict. The Court concludes that -- when it views the facts in the light most favorable to support the verdict -- sufficient evidence supports the jury's verdict finding Foghorn guilty of second-degree murder beyond a reasonable doubt. The Court also finds that there is sufficient evidence for a reasonable jury to find Foghorn guilty of kidnaping beyond a reasonable doubt. The jury was not charged with determining whether Foghorn was guilty of kidnaping resulting in death, however, and therefore he cannot be found guilty of that crime. Finally, because Foghorn has not raised any issue that impeaches the jury's verdict, the Court finds that neither further investigation nor a mistrial are required. The Court will deny the motion in part and grant the motion in part.

## PROCEDURAL BACKGROUND

On November 20, 2003, a United States grand jury returned an Indictment charging Foghorn, Trevor Nez, and Erickson Tso with the first-degree murder of Paul Williams.  See Indictment, filed November 20, 2003 (Doc. 9).  Nez and Tso each entered into plea agreements with the United States, and on August 25, 2004, the grand jury returned a Superceding Indictment against Foghorn.  The Superceding Indictment charged Foghorn with: (i) first-degree murder in violation of 18 U.S.C. § 1111; (ii) kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(2); (iii) preventing the communication of a crime to law enforcement in violation of 18 U.S.C. § 1512(a)(1)(C); and (iv) hindering, delaying, and preventing the communication of a crime to law enforcement in violation of 18 U.S.C. § 1512(a)(2)(C).  See Superceding Indictment at 1-3, filed August 25, 2004 (Doc. 76).  Foghorn was also charged with aiding and abetting each crime in violation of 18 U.S.C. § 2.  See id.

The Court conducted a jury trial from October 22, 2004 through October 29, 2004.  See Clerk's Minutes, filed October 22, 2006 (Doc. 119).  On October 29, 2004, the jury returned a verdict finding Foghorn not guilty on Count 1 (first-degree murder), Count 3 (preventing the communication of a crime to law enforcement), and Count 4 (hindering, delaying, and preventing the communication of a crime to law enforcement) of the Superceding Indictment.  See Verdict at 1-2, filed October 29, 2004 (Doc. 120)("First Verdict").  The jury was not able to reach a verdict on Count 1's lesser included offenses, second-degree murder and voluntary manslaughter, or on Count 2, kidnaping.  See id.

On November 24, 2004, the United States filed its Second Superceding Indictment, charging Foghorn with second-degree murder and kidnaping resulting in death.  See Second Superceding Indictment, filed November 24, 2004 (Doc. 128).  Count I charged Foghorn with killing Williams

"with malice aforethought[,] willfully, deliberately, maliciously, and unlawfully," and "aid[ing], abet[ting], counsel[ling], command[ing], and induc[ing] the commission of the killing of" Williams in violation of 18 U.S.C. § 1153 (offenses committed in Indian country), 18 U.S.C. § 1111 (murder), and 18 U.S.C.§ 2 (aiding and abetting). Id. at 1.  Count 2 charged that Foghorn "did unlawfully, seize, confine, kidnap and carry away . . . Williams . . . for the purpose of assaulting him and removing him from the location of the original contact," and that those actions resulted in Williams' death. Id. at 2.

1.      **The United States' Factual Case in Chief.**

At trial, Bernice Keith testified that, in the early morning hours of October 25, 2003, as she was driving to work in Farmington, New Mexico from her home near Newcomb, New Mexico, she saw a man laying in the road near the Two Grey Hills Trading Post.  See Transcript of Trial at 77:7-11 (taken July 25, 2005)("July 25 Transcript").  Keith did not know the man and did not know if there were other people nearby, so she drove to a payphone at the Two Grey Hills Chapter House to call for assistance.  See id. at 78:19-24.  From the Two Grey Hills Chapter House telephone, she could still see the injured man.  See id. at 81:18-20.

Keith called 911 and waited at the telephone until assistance arrived.  See id. at 81:12-17. Dispatcher Julia Charley testified that she received the 911 call from Keith at 4:29 a.m. on October 25, 2003, and dispatched Navajo Tribal Officer Julia Smiley to the scene.  See id. at 100:1-3 & 101:2-4.  Smiley arrived at the scene at 4:49 a.m.  See id. at 103:13-14 (Charley).

The evidence showed that there was no other 911 call or other emergency report made on October 25, 2003, regarding Paul Williams.  Further, Keith and Smiley both testified that the road where they found Williams is not heavily traveled and that there was no other traffic on the road at

that time in the morning.  See id. at 93:5-7 (Keith); 118:22-25 (Smiley).

Smiley testified that, upon her arrival to the scene at the side of the road between Two Grey Hills Trading Post and Chapter House, she saw a man moving around on his hands and knees beside the road.  See id. at 116:15-17.  She asked his name, and he was able to respond that he was Paul Williams.  See id. at 115:24 - 116:2.  Although it was cold, he was dressed only in his pants.  See id. at 116:7-14.  His other clothing, a shirt and boots, were scattered nearby.  See id.

Smiley called for an ambulance, and attempted to cover Williams and to keep him from moving around.  See id. at 122:10-17.  She testified that there is an operable payphone at the Two Grey Hills Trading Post, approximately 200 steps from where she found Williams.  See id. at 118:2-12.

Emergency Medical Technician Camilla Six testified that, upon reaching the scene where Williams was found, she and her partner placed Williams on a back board to keep him stable.  See id. at 143:17-25.  She said that Williams responded to her questioning about his injuries by motioning with his head, mumbling, and attempting to talk.  See id. at 145:11-20.  Williams' eyes were swollen shut, but Six could tell that Williams was trying to communicate with her, and he responded to directions she gave him.  See id. at 147:19-22; 149:10-17.  Six saw no other cars in the area while she was there from 5:12 a.m. to 5:30 a.m.  See id. at 152:17-22.

Jonah Wilson testified that he and Williams attended a dance at Toadlena Boarding School on the previous evening, October 24, 2003.  See Transcript of Trial at 62:19 - 63:2 (taken July 26, 2005)("July 26 Transcript").  Wilson testified that he and Williams saw Nez and Krystal Talk at the dance, and that Nez and Talk left together.  See id. at 65:14 - 67:1.  Wilson stated that he and Williams also left the dance, went driving around, eventually arrived at Turtle Rock, a common-party

-4-

spot, where they parked behind Nez' car.  See id. at 89:16 - 90:25.  Wilson estimated that he and

Williams left the dance at approximately 1:00 a.m. and arrived at Turtle Rock approximately one to

one and one-half hours later.[1]  See id. at 68:6-9; 89:21-22.  At Turtle Rock,  Nez and Williams ran

down a hill, out of the sight of the other party-goers, and engaged in a fight.  See id. at 95:12-15.

During the fight, Nez beat Williams in the head with a rock.  See Transcript of Trial at 135:20 -

136:4 (taken July 27, 2005)("July 27 Transcript")(Nez).

Federal Bureau of Investigation Special Agent Laura Walter testified that she and Special

Agent Jeffrey Walter interviewed Nez and Talk on October 25, 2003.  See id.  at 122:16-24.  The

agents interviewed Foghorn on October 27, 2003.  See id. at 123:12-13.  During the interview of

Foghorn, he initially told the agents that he had seen Nez in the early morning hours of October 25,

2003, but made no reference to Williams.  See id. at 124:22 - 125:8.  When asked to clarify some

of his responses, Foghorn subsequently changed his story and admitted that he, Nez, and Tso had

gone to Turtle Rock in an effort to find Williams because Nez had suggested that, after the fight, he

was not sure if Williams was dead or not.  See id. at 125:11-21.  Foghorn indicated that the men

found Williams lying in the field.  See id. at 125:22-23.  He then asserted that he and Tso watched

while Nez hit Williams with a stick, performed wrestling moves on Williams, and undressed him.

See id. at 125:22 - 126:3.

Foghorn modified his version of the events again in a second interview on the same day.

Foghorn told the agents that Nez came to his family's home early in the morning of Saturday,

---

[1]Talk, Wilson, Nez, and Foghorn each testified at trial that they could not specify times
beyond estimate.  See July 26 Transcript at 26:3-5 (Talk); July 26 Transcript at 67:14 - 68:4
(Wilson); Transcript of Trial at 131:12-17 (taken July 27, 2005)("July 27 Transcript")(Nez); July 27
Transcript at 40:5-10 (Foghorn).

October 25, 2003, at approximately 2:00 or 2:30 a.m.  See id. at 130:20-23.  Foghorn noticed blood on Nez, and Nez told him that he had been in a fight with Williams.  See id. at 131:2-6.  Foghorn told the agents that he drove Nez back to Turtle Rock where Nez' car was still parked.  See id. at 131:9-15.  Nez retrieved some beer and a bag from his car, and the two drove from Turtle Rock to Tso's house.  See id. at 131:16.  When Tso heard the story about the fight Nez had with Williams, Nez and Tso got "riled up and angry" and wanted to return to Turtle Rock to see if Williams was dead or alive.  Id. at 131:19-23.  The three men returned to Turtle Rock and Nez took them to Williams.  Williams appeared to be asleep on the ground, so Nez kicked him to wake him up.  See id. at 132:1-3.

Finally, Foghorn admitted to the agents that he -- not Nez – was the one who performed back flips and wrestling moves on Williams.  See id. at 132:4-7.  Foghorn added that, when Nez began to undress Williams, he helped take off Williams' boots, and Tso took off Williams' shirt.  See id. at 133:11-15.  Foghorn contended that he then watched Nez beat Williams with branches.  See id. at 133:20-22.  Throughout the encounter, Williams was aware that he was being attacked and responded to Nez' taunts.  See id. at 136:20-25.

Foghorn contended that he and Tso told Nez "not to do anything to Mr. Williams' face," because his face was "messed up and bloody."  Id. at 134:6-10.  Foghorn said that he did not kick Williams in the face, but did kick him in the leg and that Tso kicked him in the ribs.  See id. at 134:13-22.  Foghorn added that Nez threw a rock on Williams' stomach and was going to throw it on his head, but Foghorn stopped Nez.  See id. at 134:25 -135:4.  Foghorn admitted to the agents that he poured beer, and that Nez urinated, on Williams' head.  See id. at 134:10-12.  At trial, Foghorn also admitted he jumped on Williams' stomach with both feet.  See id. at 304:13-18 (Foghorn).

-6-

Foghorn told the agents that he thought Williams would freeze if they left him naked at Turtle Rock, so he and Tso put Williams' pants back on. See id. at 135:11-13 (L. Walter). Foghorn, Tso, and Nez then put Williams in the back of Foghorn's pick-up truck. See id. at 135:13-14. Foghorn told the FBI agents that, when Williams, Foghorn, Nez, and Tso arrived at the intersection near Two Grey Hills Trading Post, he pulled Williams out by his feet, and Williams' body and head hit the ground. See id. at 135:18-22.

After removing Williams, Foghorn, Nez, and Tso noticed a puddle of Williams' blood in the bed of the truck. See id. at 136:3-4. The three poured water on the blood, and used Williams' shirt and other clothes to wipe it up. See id. at 136:4-7. They dropped the wet shirt on Williams and left him lying to the side of the road. See id. at 136:6-7. Walter stated that Foghorn believed they left Williams by the side of the road between 3:00 a.m. and 4:00 a.m. on October 25, 2003. See id. at 136:8-11.

After abandoning Williams, Foghorn drove Nez and Tso to the home of Nez' girlfriend, Sharday Charley. See id. at 137:5-6. Foghorn indicated that Charley gave Nez some money. See id. at 137:9. Foghorn, Nez, and Tso then drove to an all-night Mustang store to purchase gas for Foghorn's truck. See id. at 137:10-11. Foghorn pumped the gas and went into the store to pay because Nez had blood on his clothing. See id. at 137:12-14. Foghorn admitted that he knew the Mustang had a telephone, but made no calls for help there or elsewhere. See July 27 Transcript at 40:12 - 41:24.

On October 29, 2004, in his first trial in relation to this matter, Foghorn was acquitted of first degree murder; the jury was not able, however, to return a verdict on the lesser included offenses of second-degree murder or voluntary manslaughter, or on the charge of kidnaping. The United States

filed its Second Superceding Indictment on November 24, 2004, and the matter was retried from July 25 to July 27, 2005.  At the second trial, Assistant United States Attorney Carson McNabb and Special Agent Jeffrey Walters read Foghorn's testimony from the first trial to the jury.  In his sworn trial testimony, Foghorn repeated much of what he had previously told the FBI agents, but added some additional information regarding Williams' condition just before Foghorn, Nez, and Tso abandoned him. Foghorn stated for the first time that, when he pulled Williams out of the pickup, Williams reached down to catch himself rather than allow his head to hit the ground.  See July 26 Transcript at 314:20-23.

### 2.     The United States' Experts.

The United States introduced expert testimony from two doctors: (i) Dr. Harry Bisharra, Williams' treating physician in the emergency room at the hospital in Shiprock, New Mexico; and (ii) Dr. Jeffrey Nine, the pathologist from the New Mexico Office of the Medical Examiner (OMI), who performed Williams' autopsy.  See United States' Response to Defendant's Motion for Judgment of Acquittal Filed August 22, 2005 at 7, filed December 9, 2005 (Doc. 220).

Dr. Bisharra, a longtime emergency-room physician, testified about Williams' condition when he was admitted to the emergency room in Shiprock, and the various ways in which the hospital attempted to treat him.  See July 26 Transcript at 189:13 - 206:5.  Dr. Bisharra explained that, as the treating physician, he might not be able to tell precisely what killed a patient, but that he compiled a discharge diagnosis.  See id. at 206:6-15.  He stated that Williams suffered from a cerebral edema, subdural hematoma, broken jaw, severe lactic acidosis, hypothermia, and cardiopulmonary arrest.  See id. at 207:1-9.  He characterized the cerebral edema as being the most serious because "it's very difficult to survive severe cerebral edema."  See id. at 207:3-6.  The

hypothermia complicated the injury, because, as Williams began to warm in the ambulance and in the hospital, his brain functioning began to deteriorate.  See id. at 196:17-21.  Dr. Bisharra stated that, in his opinion, being wet, nude, and being driven in the back of a moving pickup in cold temperatures could definitely amplify symptoms of hypothermia and exacerbate some of the other conditions that resulted in Williams' death.  See id. at 211:11-24.

Dr. Bisharra stated  that it was obvious that being dragged out of a pickup and having his head hit the ground would make Williams' head injury worse.  See id. at 212:11-15.  He also testified that repeated injury, such as a boxer might receive by many blows, can cause cerebral edema.  See id. at 213:5-10.  Dr. Bisharra testified that it was not possible to say at precisely what point during the evening Williams' condition became fatal, see id. at 217:2-21, and that repeated trauma accumulates to increase the severity of an injury on the victim.  See id. at 235:23 - 236:5.

Dr. Nine testified that he participated in Williams' autopsy.  See id. at 263:17-20.  He testified to the extent of the injuries that Williams suffered, including jaw fractures, see id. at 267:15-18, various broken bones, see id. at 267:21-25, skull fractures, see id. at 270:12-14, a subdural hematoma, see id. at 271:6-8, and pattern injuries that appeared consistent with severe whipping by a stick or branch, see id. at 272:2-8.  After examining Williams, Dr. Nine identified the cause of death as blunt force injuries to the head and neck.  See id. at 286:20-25.  Dr. Nine indicated that it was not possible to determine the order in which the injuries were suffered.  See id. at 291:18-23.  Although Dr. Nine acknowledged that the other injuries Williams suffered were quite severe, and could potentially be fatal to a person in a debilitated state, he stated that, given the facts and circumstances he was aware of in Williams' case, those other injuries, standing alone, would likely not have caused Williams' death.  See id. at 293:20 - 294:4.

4.      **Foghorn's Expert.**

Foghorn introduced expert medical testimony from Dr. Don Seelinger.  Dr. Seelinger testified that brain swelling and blunt injury to the brain was "the ultimate cause or the primary cause of death." July 27 Transcript at 94:17-20.  He testified that Williams' injuries were complicated by the amount of alcohol in his system and by the hypothermia he developed over the course of the night.  See id. at 94:24 - 96:3.

Dr. Seelinger based his conclusions on the assumption that all of Williams' head injuries were suffered during his initial confrontation with Nez at Turtle Rock when Nez beat Williams with the rock.  See id. at 102:16-21.  Dr. Seelinger testified that it was his opinion that, if help had been sought immediately after Williams sustained his original head injuries, Williams would have had a chance of survival.  See id. at 104:9-13.

For purposes of his testimony, Dr. Seelinger assumed that those initial injuries occurred between 1:15 a.m. and 1:30 a.m., see id. at 103:8-14, and that Foghorn first arrived at the site where Williams already lay injured sometime after 3:30 a.m., see id. at 107:7-17.  According to Dr. Seelinger, Williams' chances of survival would have been significantly reduced in the time between 1:30 a.m. and 3:30 a.m., because Williams' hypothermia would have advanced significantly.  See id. at 107:11-17.  It was Dr. Seelinger's opinion that, by the time Williams was left by the side of the road at approximately 4:00 a.m., his chances of survival were "nil."  Id. at 108:4-10.

Finally, Dr. Seelinger testified that Williams had some injuries that could be related to his fall from the bed of Foghorn's pickup truck to the ground, see id. at 108:14-18, but that, in his opinion, it was not probable that the fall would have caused a serious head injury, see id. at 109:5-10.  Nonetheless, Dr. Seelinger described the analysis of Williams' condition as a "progressive problem,"

and although he noted that Williams chances of survival diminished as time passed throughout the night, he acknowledged that "there's no one point in time where it actually drops off" and survival can be conclusively ruled impossible.  See id. at 121:21 - 122:1.

     **5.**      **Jury Instructions**.

          **a.**      **Forghorn's Second Trial.**

      The murder instruction that the Court read to the jury provides that the United States must prove beyond a reasonable doubt, among other things, that "the defendant caused the death of the victim named in the indictment."  Court's Final Jury Instructions w/ Citations, Instruction No. 14, at 15, filed July 27, 2005 (Doc. 204)("Jury Instructions").  The Court's kidnaping instruction defined "kidnap" as meaning "to unlawfully hold, keep, detain, and confine the person against that person's will."  Id. Instruction No. 17, at 18.  The Court's kidnaping instruction did not instruct the jury to make any finding regarding whether any kidnaping was a proximate cause of Williams' death.  See id.  The Court included the United States' Second Superceding Indictment as Instruction No. 12. Count 2 of the Second Superceding Indictment charged that Foghorn "did unlawfully, seize, confine, kidnap and carry away . . . Williams . . . for the purpose of assaulting him and removing him from the location of the original contact, . . . resulting in the death of Paul Garcia Williams, Jr."  Jury Instructions, Instruction No. 12, at 13.

      The jury was further instructed that, "[w]hen the conduct of two or more persons contributes concurrently as proximate causes of death, the conduct of each person is a proximate cause regardless of the extent to which each contributes to the death,"  id. Instruction No. 16, at 17, and that "[w]hen a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger,"  id. Instruction No. 15, at 16.  Finally, the Court  instructed

the jury that Foghorn could be punished as a principal if it determined that he aided and abetted the commission of Williams' murder or kidnaping. See id. Instruction 19, at 21. The Court told the jury that, to find Foghorn guilty in this manner, they must find that "someone else committed the charged crime," and that Foghorn "intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about." Id.

The verdict form that the Court gave to the jury in Foghorn's second trial requested only two findings. See Verdict, filed July 27, 2005 (Doc. 200). The jury was directed to find Foghorn guilty or not guilty of "Second Degree Murder as charged in Count I of the of the [sic] indictment," and guilty or not guilty of "kidnapping [sic] as charged in Count II of the indictment." Id.

Both Foghorn and the United States submitted proposed jury instructions to the Court before Foghorn's first trial; only Foghorn submitted additional proposed jury instructions before the second trial. See Defendant's Proposed Jury Instructions, filed July 15, 2005 (Doc. 178). Foghorn's proposed instructions for the second trial do not include any requested modification to the Court's instruction regarding the elements of kidnaping.

### b.      Kidnaping Instructions in Foghorn's First Trial.

The Court's kidnaping instructions in Foghorn's first trial differed from its instruction in the second trial in two ways. First, the Court instructed the jury that, to find Foghorn guilty of kidnaping under 18 U.S.C. § 1201(a)(1), it must find beyond a reasonable doubt that Foghorn kidnaped Williams "by seizing, abducting, carrying away, confining, or inveigling him." Court's Final Set of Jury Instructions w/ Citations, Instruction No. 20, at 25, filed October 17, 2004 (Doc. 118)("First Trial Jury Instructions")(emphasis added). The Court's instructions in Foghorn's second trial did not include "inveigling" as a method of kidnaping. See Jury Instructions, No. 17, at 18. Second, the

Court instructed the jury in the first trial that, as an element of kidnaping, the jury must find beyond a reasonable doubt that Foghorn "willfully transported the person kidnapped [sic]." First Trial Jury Instructions, Instruction No. 20, at 25. The Court did not include willful transportation as an element of kidnaping in the second trial. See Jury Instructions, No. 17, at 18.

Consistent with its instructions in the second trial, the Court did not instruct the jury in the first trial that they must find that any kidnaping resulted in Williams' death, or charge them with finding a causal connection between any kidnaping or Williams' death. See First Trial Jury Instructions, Instruction No. 20, at 25. The Court included the United States' Indictment as Instruction No. 14. Count 2 of the Indictment charged that Foghorn "did unlawfully, seize, confine, inveigle, decoy, kidnap, abduct and carry away . . . Williams . . . for the purpose of assaulting him and removing him from the location of the original contact, . . . resulting in the death of Paul Garcia Williams, Jr." First Trial Jury Instructions, Instruction No. 14, at 15. Finally, similar to the verdict form in the second trial, the verdict form presented to the jury in the first trial directed the jury to find Foghorn guilty or not guilty of "[k]idnapping [sic] as charged in Count II of the indictment." First Verdict.

Unlike the second trial, however, both the United States and Foghorn submitted proposed jury instructions in the first trial that recognized, at least to some degree, a possible causation element of a kidnaping resulting in death charge. The United States expressly requested that the jury be charged with finding "[t]hat the kidnaping resulted in the death of the victim." United States' Requested Jury Instructions, Government's Requested 8, at 19, filed October 18, 2004 (Doc. 102). Foghorn's proposed instruction, based on the Tenth Circuit Criminal Pattern Jury Instruction 2.55, did not include language directing the jury to make any finding related to causation. See Defendant's

Proposed Jury Instructions at 19, filed October 18, 2004 (Doc. 101)("Defendant's First Proposed Jury Instructions"). Foghorn attached to his proposed instruction, however, portions of the Tenth Circuit's comment to Jury Instruction 2.55.

> An additional element, prompted by the <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) doctrine, is required when the indictment alleges that the kidnapping resulted in the death of a person and the prosecution is seeking the death penalty. If a disputed issue is whether a death resulted, a court should consider giving a lesser included offense instruction.

<u>See</u> <u>id.</u> at 20-21; Tenth Circuit Criminal Pattern Jury Instruction 2.55 cmt., at 189 (2005).

### 6. <u>Jury Deliberations</u>.

In support of this motion, Foghorn attached the affidavit of Amy J. Smith, a juror in Foghorn's second trial. <u>See</u> Motion for Acquittal, Exhibit A, Affidavit of Amy J. Smith (given August 20, 2005)("Smith Affidavit"). Smith states that, while the jurors were deliberating after the close of evidence, one of the jurors remarked "those poor Indians and their alcohol." <u>Id.</u> ¶ 7, at 2.

### 7. <u>Verdict</u>.

At Foghorn's second trial, the jury found that the United States proved Foghorn guilty beyond a reasonable doubt of Second-Degree Murder and Kidnaping. <u>See</u> Verdict, filed July 27, 2005 (Doc. 200). On August 22, 2005, Foghorn filed a Motion for Judgment of Acquittal, pursuant to rule 29(c) of the Federal Rules of Criminal Procedure, asking the Court to enter a judgment of acquittal on both counts -- Counts I and II -- of the Second Superceding Indictment. <u>See</u> Motion for Acquittal. Foghorn contends the United States did not present sufficient evidence for a reasonable jury to convict Foghorn of Second Degree Murder or Kidnaping Resulting in Death as a matter of law.

## STANDARD FOR DECIDING MOTIONS FOR ACQUITTAL

The Supreme Court of the United States has long recognized the government's burden to prove every element of a criminal charge beyond a reasonable doubt as a constitutional imperative. See In re Winship, 397 U.S. 358, 362 (1970). This requirement, applied through the rules of evidence consistent with that standard, "are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." Id. (quoting Davis v. United States, 160 U.S. 469, 488 (1895)).

When reviewing challenges to the sufficiency of evidence underpinning a criminal conviction, courts must evaluate the direct and circumstantial evidence, together with all reasonable inferences that might be drawn from that evidence, in the light most favorable to the government, and determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. See United States v. Isaac-Sigala, 448 F.3d 1206, 1210 (10th Cir. 2006). A jury's finding should not be overturned "unless no reasonable juror could have reached the disputed verdict." United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997). The court should let stand the conviction where a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. McPhilomy, 270 F.3d 1302, 1307 (10th Cir. 2001)(quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

In evaluating a sufficiency of the evidence challenge made after a defendant has presented his case-in-chief, the court is not limited to reviewing the government's case-in-chief alone, but may review the entire record, including evidence that the defendant presents. See United States v. Delgado-Uribe, 363 F.3d 1077, 1082 (10th Cir. 2004). The court may not, however, weigh conflicting evidence or consider the credibility of witnesses. See United States v. McKissick, 204

F.3d 1282, 1289 (10th Cir. 2000).  It is the jury's responsibility to appraise witness credibility, weigh testimony, draw reasonable inferences, and reach a conclusion as to a defendant's guilt.  See United States v. Cooper, 375 F.3d 1041, 1044 (10th Cir. 2004). The court's duty is to "determine whether the evidence, if believed, would establish each element of the crime."  United States v. Vallos, 238 F.3d 1242, 1247 (10th Cir. 2001)(quoting United States v. Evans, 42 F.3d 586, 589 (10th Cir. 1994)).

Although the jury's decision is afforded great deference, "the evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained."  United States v. Weidner, 437 F.3d 1023, 1032 (10th Cir. 2006)(quoting United States v. Fox, 902 F.2d 1508, 1513-14 (10th Cir. 1990)).  In reaching a conviction, juries have "wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence," but inferences are reasonable only when "with experience serving as the touchstone[,] . . . there is a reasonable probability that the conclusion flows from the facts in evidence." United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005)(internal citation omitted).   Where an inference relates to an ultimate conclusion underpinning criminal liability, "a jury may draw [the] inference only where that inference can be made beyond a reasonable doubt."  Id. at 1295 n.4 (quoting United States v. Rahseparian, 231 F.3d 1257, 1264 (10th Cir. 2000)).

## LAW REGARDING CAUSATION IN A MURDER CHARGE

To reach a conviction for murder in the second degree, a jury must find that a defendant caused the death of the victim named in the indictment, and that the murder was committed with malice aforethought.  See United States v. Swallow, 109 F.3d 656, 659 (10th Cir. 1997)("Proximate

-16-

cause of death is an essential component of . . . second-degree murder."); 18 U.S.C. § 1111; Tenth

Circuit Criminal Pattern Jury Instruction 2.53, at 182 (2005).  The United States Court of Appeals

for the Tenth Circuit has stated that "where more than one person's actions contribute to an unlawful

result . . . each individual's act is sufficient to render him culpable as a principal for the harm

caused."  United States v. Hatatley, 130 F.3d 1399, 1406 (10th Cir. 1997).  In cases where a death

could allegedly be attributable to multiple causes, an individual can be the legal cause of death even

if other causes significantly contribute to the victim's death.  See United States v. Woods, 59 Fed.

Appx. 319, 324 (10th Cir. 2003)("[W]hen the conduct of two or more persons contributes

concurrently as a proximate cause of death, the conduct of each person is a proximate cause,

regardless of the extent to which each contributes to the death.")(citing United States v. Hatatley, 130

F.3d at 1405-06);[2] State v. Montoya, 2003-NMSC-4, ¶ 19, 61 P.3d 793, 799 ("Criminal law only

requires that a defendant be 'a' but for cause of death and not 'the' but for cause of death.").

Accordingly, even if a victim has already received a mortal wound, a subsequent actor is still

liable for the victim's death if his act substantially hastens the victim's death.  See Wayne R. LaFave,

Criminal Law § 6.4(b), at 335 (4th ed. 2003)("LaFave")(noting an actor who substantially hastens

the death of a victim who has already sustained a mortal wound "is surely a cause of [the victim's]

death"); Oxendine v. State, 528 A.2d 870, 872-73 (Del. 1987)(holding an actor who inflicts a second

non-mortal injury can be considered the cause of a victim's death only if his actions caused the

victim to die sooner than he otherwise would); People v. Dlugash, 363 N.E.2d 1155, 1158-59 (N.Y.

---

[2]The Tenth Circuit Rule 36.3(B) states: "Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition."  This unpublished decision meets both these criteria, and the rules therefore allow citation to this unpublished decision.

1977)(ruling causation was not established when prosecution failed to prove beyond a reasonable doubt that victim was alive when defendant shot victim five times).  This rule is true even if the victim would have died of the initial wound alone, or would not have died of the subsequent act had it not been performed in concert with, or in addition to, the earlier, independent action.  See People v. Brown, 216 P. 411, 413 (Cal. Ct. App. 1923).  Likewise, when a defendant inflicts what would be a non-fatal wound in a person of ordinary health, but the victim is in a weakened state because of prior wounds, exposure, or intoxication, so that he dies, the defendant is considered the direct cause of the victim's death.  See LaFave § 6.4(f)(2), at 343-44.

## LAW REGARDING KIDNAPING CHARGE

Foghorn's motion raises two issues with respect to his kidnaping conviction.  First, Foghorn contends that the evidence presented at trial was not sufficient to satisfy the purpose element of a kidnaping conviction.  Second, Foghorn argues that the evidence presented at trial was not sufficient for the jury to conclude that any kidnaping resulted in Williams' death.

### 1.    Purpose Element.

Before 1934, the Federal Kidnaping Act, 18 U.S.C. § 1201, required, to support a conviction, a kidnaper to have a pecuniary motive for the kidnaping.  See United States v. Healy, 376 U.S. 75, 81 (1964).  In 1934, however, Congress amended the act and made it applicable whenever a victim was unlawfully seized "for ransom or reward or otherwise."  18 U.S.C. § 1201 (emphasis added). Two years later, in Gooch v. United States, 297 U.S. 124 (1936), the Supreme Court of the United States interpreted the phrase "'or otherwise' . . . to encompass any benefit which a captor might attempt to receive for himself."  United States v. Walker, 137 F.3d 1217, 1219 (10th Cir. 1998)(citing Gooch v. United States, 297 U.S. at 128).  See United States v. Gabaldon, 389 F.3d

1090, 1096 (10th Cir. 2004)(describing kidnaping statute's benefit requirement as "very lax").

Holding a victim for the purpose of enabling captors to inflict additional harm upon the victim, and

transporting the victim in an effort to make the victim more or less likely to be discovered by others,

are purposes sufficient to satisfy the kidnaping statute.  See United States v. Gabaldon, 389 F.3d at

1095-96 (transporting victim to provide captor with greater secrecy in disposing of victim's body

and an opportunity to destroy incriminating evidence satisfied the benefit requirement of 18 U.S.C.

§ 1201); United States v. Sarracino, 131 F.3d 943, 947 (10th Cir. 1997)(holding removal of victim

to a remote location which permitted captors to continue beating victim in secrecy satisfied the

benefit requirement of 18 U.S.C. § 1201).

### 2.   **Kidnaping Resulting in Death.**

A defendant who is found guilty of violating 18 U.S.C. § 1201 "shall be punished by

imprisonment for any term of years or for life and, if the death of any person results, shall be

punished by death or life imprisonment."  18 U.S.C. § 1201(a).  See Jones v. United States, 527 U.S.

373, 376 (1999).  In United States v. Woodlee, 136 F.3d 1399, 1405 (10th Cir. 1998), the Tenth

Circuit was called to consider language closely analogous to the "if the death of any person results"

clause of 18 U.S.C. § 1201(a).  The defendants in United States v. Woodlee had been convicted of

interference with federally protected rights pursuant to 18 U.S.C. § 245.  Defendants convicted under

18 U.S.C. § 245 are subject to fine, or imprisonment of less than one year, but "if bodily injury

results . . . shall be fined under this title, or imprisoned not more than ten years, or both."  18 U.S.C.

§ 245(b).

The defendants in United States v. Woodlee argued that, while there was sufficient evidence

to sustain a misdemeanor conviction based on a satisfaction of all the enumerated elements of an

interference with federally protected rights charge, there was insufficient evidence to sustain a felony conviction, which, according to the defendants, specifically required a finding of bodily injury and intent to injure. See 136 F.3d at 1405. The Tenth Circuit denied that the statute required a showing of intent and held that the statute's language "expressly provides the government need only show the defendants' illegal conduct resulted in bodily injury; not that the defendants intended bodily injury." Id. (emphasis in original). According to the Tenth Circuit, "the standard 'is one of causation, not state of mind.'" Id.

In the specific context of 18 U.S.C. § 1201(a), at least one federal district court has determined that the "'if the death of any person results' provision . . . requires the government to prove proximate causation." United States v. Mayhew, 380 F. Supp. 2d 936, 958 (S.D. Ohio 2005). In United States v. Mayhew, the United States District Court for the Southern District of Ohio described this requirement as "a separate element that needs to be charged in the indictment and proved beyond a reasonable doubt to the petit jury." Id. at 960. In the commentary to its pattern jury instruction for 18 U.S.C. § 1201(a)(1), the Tenth Circuit's Criminal Pattern Jury Instruction Committee has also suggested that "if the death of any person results" is an additional element and added that, "[i]f a disputed issue is whether a death resulted, a court should consider giving a lesser included offense instruction." Tenth Circuit Criminal Pattern Jury Instruction 2.55 cmt., at 189 (2005). Several other courts have taken a similar position when interpreting comparable statutes. See United States v. Wiegand, No. 93-1735, 1994 U.S. App. LEXIS 37209, at *5 (6th Cir. Dec. 22, 1994)(ruling the punishment-enhancing element of 42 U.S.C. § 3631 -- "if bodily injury results"-- was not violative of due process because the district court's jury instructions included a causation element)(unpublished opinion); United States v. Hayes, 589 F.2d 811, 821 (5th Cir. 1979)("When

the Congress provided that any deprivation of defined rights under color of law resulting in death may be punished by life imprisonment, we must consider it to have been fully cognizant of the principles of legal causation."); United States v. Guillette, 547 F.2d 743, 749 (2d Cir. 1976)("We find the principle of proximate cause embodied in § 241 through the phrase 'if death results.'").

## LAW REGARDING AIDING AND ABETTING

To be found guilty of a crime under a theory of aiding and abetting, "the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own."  United States v. Anderson, 189 F.3d 1201, 1207 (10th Cir. 1999). Pursuant to 18 U.S.C. § 2, a defendant convicted of aiding and abetting the commission of a crime is punishable as a principal.  See 18 U.S.C. § 2.

A conviction for aiding and abetting requires proof that "the defendant participated in the venture."  United States v. Sarracino, 131 F.3d at 946 (listing elements of aiding and abetting).  A defendant's participation in a crime "may be established by circumstantial evidence and the level of participation may be of 'relatively slight moment.'"  United States v. Isaac-Sigala, 448 F.3d at 1210. It is not enough, however, that a defendant be present at the scene of a crime, or even that he knows that a crime is being committed; rather, the defendant must share the principal's desire to achieve the objective of the crime and engage in some affirmative act tailored to manifest that objective.  See United States v. King, 936 F.2d 477, 481-82 (10th Cir. 1991).

## LAW REGARDING JUROR TESTIMONY

The district court has broad discretion in determining how to deal with allegations of juror bias.  See United States v. McHorse, 179 F.3d 889, 904 (10th Cir. 1999).  Nevertheless, once a verdict has been entered, courts should be reluctant "to haul jurors in . . . to probe for potential

instances of bias, misconduct, or extraneous influences." United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003)(quoting Neron v. Tierney, 841 F.2d 1197, 1205 (1st Cir. 1988)). The court must determine "whether actual bias existed or whether the circumstances compel an imputation of inherent bias to the juror as a matter of law such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Lawrence, 405 F.3d 888, 903 (10th Cir. 2005). Post-trial investigations are not an opportunity for a convicted defendant to conduct a "fishing expedition," but are appropriate only where "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) (internal citation omitted).

After the entry of a verdict, rule 606(b) of the Federal Rules of Evidence prohibits a juror from testifying regarding anything that occurred "during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith." Fed. R. Evid. 606(b). In addition to live testimony, the prohibition extends to the consideration of any juror affidavit or any other evidence of any juror's statement concerning a matter about which juror testimony is proscribed. See id. ("Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."). This rule is an expression of the public policy preference for finality in litigation and the recognition that "common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts." Tanner v. United States, 483 U.S. 107, 124 (1987). Without such a rule, jurors would undoubtedly

be subject to harassment from losing parties attempting to discover grounds on which to challenge verdicts and, therefore, "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." Id. at 120-21.

Rule 606(b) contains one exception, allowing a juror to testify with regard to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."[3]   Fed. R. Evid. 606(b). Nevertheless, in light of the policy factors underlying the general rule, this exception has been narrowly construed.  See Tanner v. United States, 483 U.S. at 117-27 (prohibiting juror testimony regarding jurors' drug and alcohol use during a criminal trial).  In cases involving allegations of racial bias, the Tenth Circuit has acknowledged the usefulness of voir dire and evidentiary hearings before a verdict is entered, and cautioned that all inquiries– whether before or after the entry of a verdict– should be conducted within the limitations of rule 606(b) and local rules.  See United States v. Davis, 1 F.3d 1014, 1016 (10th Cir. 1993).

---

[3]On April 12, 2006, the Supreme Court of the United States adopted a new version of rule 606(b), effective December 1, 2006.  The amended version of the rule now permits juror testimony to also be used to prove that the verdict reported was the result of a clerical mistake in entering the verdict on the verdict form.  See Fed. R. Evid. 606(b) advisory committee's note (2006).  The relevant portion of the rule now states:

> But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b).

When presented with evidence of racial bias within the jury, "[c]ourts and commentators have struggled with the apparent conflict between protecting a defendant's right to a fair trial, free of racial bias, and protecting the secrecy and sanctity of jury deliberations." United States v. Henley, 238 F.3d 1111, 1119 (9th Cir. 2001). Some courts have suggested that, "consistent with the text of [rule 606(b)], as well as with the broad goal of eliminating racial prejudice from the judicial system, . . . evidence of racial bias is generally not subject to Rule 606(b)'s prohibitions against juror testimony." Id. at 1120. Other courts, however, continue to note that consideration of post-verdict evidence related to racial bias is "problematic," because it is at odds with the deeply rooted policy justifications that support the rule prohibiting impeachment of jury verdicts. Williams v. Price, 343 F.3d 223, 239 (3d Cir. 2003)(Alito, J.)(noting that "[no] Supreme Court decision clearly establishes that it is unconstitutional . . . to apply a 'no impeachment' rule that does not contain an exception for juror testimony about racial bias on the part of jurors"). See Georgia v. McCollum, 505 U.S. 42, 61-62 (1992)(Thomas, J., concurring in judgment)("Unless jurors actually admit prejudice during voir dire, defendants generally must allow them to sit and run the risk that racial animus will affect the verdict.")(citing rule 606(b) and noting that the rule generally excludes post-trial juror testimony impeaching the verdict). The Tenth Circuit has not conclusively decided whether a court may consider post-verdict allegations of racial prejudice or racial pressures. See Brown v. Gibson, 7 Fed. Appx. 894, 908-09 (10th Cir. 2001)(assuming, without deciding, that the court could consider a juror affidavit alleging racial pressures in juror deliberations).

## ANALYSIS

Foghorn challenges his convictions on both counts. His approach, however, would require the Court to disregard some of the evidence that is favorable to the United States. Because the Court

cannot, on this motion, view the evidence in such a manner, the Court will deny his motion as to the second-degree murder conviction, but grant his motion in part on the kidnaping conviction.

## I.   A REASONABLE JURY COULD HAVE FOUND FOGHORN GUILTY BEYOND A REASONABLE DOUBT OF SECOND-DEGREE MURDER.

Foghorn is asking the Court to review the jury's determination of his guilt. Foghorn contends that the evidence introduced against him at trial was insufficient to sustain the convictions on either of the two counts with which he was charged. Foghorn is mistaken in his belief. Once the verdict is entered, the Court must now view the evidence in the light most favorable to support the verdict. Viewed in the light most favorable to the United States, the evidence introduced at trial was sufficient to sustain a conviction of second-degree murder.

### A.   SUFFICIENT EVIDENCE SUPPORTS THE JURY'S VERDICT THAT FOGHORN WAS GUILTY OF SECOND-DEGREE MURDER.

To prove Foghorn guilty of second-degree murder, the United States was required to establish: (i) that Foghorn caused the death of Williams with malice aforethought; (ii) that Foghorn is an Indian; and (iii) that the crime occurred in Indian country. See 18 U.S.C. § 1111; Tenth Circuit Criminal Pattern Jury Instruction 2.53, at 182 (2005). Foghorn stipulated that he is an Indian and that the crime occurred in Indian Country.

The United States may prove malice aforethought by proving that Foghorn intended to kill or seriously injure Williams, or that his conduct was so reckless and wanton that a jury could infer that he was aware of the serious risk of Williams' death or serious bodily injury. See United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001). Evidence of malice aforethought may also include evidence that Foghorn put Williams in serious risk of death and then failed to safeguard him. See United States v. Hatatley, 130 F.3d at 1406. Foghorn does not argue that a reasonable jury could not

-25-

have found that Williams was killed with malice aforethought.  The facts viewed in the light most favorable to the verdict support a conclusion that a reasonable jury could find malice aforethought.

Foghorn challenges only one element of the conviction for second-degree murder– whether evidence and non-attenuated rational inferences therefrom support the finding that Foghorn caused the death of Williams within the meaning of the law.  Foghorn's thesis is that, as a technical matter, Williams was already so severely injured when Foghorn arrived on the scene that Williams was essentially dead, even though Williams lived at least five hours after Foghorn arrived.  The facts, viewed in a light most favorable to the United States, and the law, however, do not compel his argument.  Foghorn's analysis is premised on a theory that the evidence presented to the jury did not unequivocally support.  The evidence was sufficient for a reasonable juror to conclude that: (i) Foghorn's own actions were the proximate cause, or at least a contributory cause, of Williams' death; (ii) Foghorn failed to rescue Williams after placing him in a position of danger; and/or (iii) Foghorn aided and abetted Nez and Tso in the commission of Williams' murder.

### 1.    Guilt as a Principal.

Foghorn admits that he participated in the second beating of Williams and that he did nothing to ensure that Williams received medical attention, even though he knew Williams was seriously hurt.  See July 27 Transcript at 41:25 - 42:11 (Foghorn).  He does not contest the United States' facts regarding the brutal treatment of Williams at his hands.

The evidence showed that Foghorn arrived at the scene where Williams lay injured; he evaluated the situation and realized that Williams was seriously injured.  See July 26 Transcript at 302:25 - 303:3 (Foghorn).  He also knew that Williams was alive and aware of his surroundings, and that Williams knew the identity of at least one his attackers.  See id. at 308:10-18.  Instead of leaving

the scene or acting to assist Williams, Foghorn joined Nez and Tso in beating Williams, stripping him of his clothes, and covering him in beer and urine.  See id. at 304:11 - 308:9; July 27 Transcript at 28:17-19 (Foghorn).  It is not disputed that Williams sustained numerous additional injuries at the hands of Foghorn, including continued exposure to the elements.

When Foghorn, Nez, and Tso finished beating Williams, they loaded him into the open bed of Foghorn's pickup truck.  See July 26 Transcript at 312:4-8 (Foghorn).  Despite that he was wet from blood, beer, and urine, the men did not fully redress Williams, but placed him in the truck without his shirt or boots.  See id. at 311:25 - 312:2.  Foghorn then drove Williams away from the crime scene and left him abandoned by the side of the road near the Two Gray Hills Trading Post. See id. at 316:1-5.  Foghorn continued to drive for some time, making stops at Charley's house and a twenty-four hour gasoline station.  See July 27 Transcript at 41:5-14 (Foghorn).  Foghorn acknowledged that he knew that the gas station had a telephone, but at no time did he call for emergency medical services or make any other attempt to assist Williams.  See id. at 41:15-24.

Foghorn contends that Nez' blows to Williams' head during Nez' and Williams' first confrontation at Turtle Rock solely caused Williams' death.  Foghorn contends that any injuries he may have later inflicted on Williams were non-lethal and did not constitute either the cause or a contributory cause of Williams' death.  Foghorn acknowledges the reprehensible nature of his actions on the morning of October 25, 2003, but argues that the United States did not present sufficient evidence for a reasonable jury to conclude that his actions caused Williams' death.

Foghorn's argument is not persuasive, however, because the jury could accept that Nez and only Nez caused Williams' severe head injuries, and still find that Foghorn participated in the murder.  An individual can be the legal cause of death even if other causes significantly contribute

to the victim's death.  See United States v. Woods, 59 Fed. Appx. at 324.  In addition, even if the

blows that Nez inflicted on Williams would have been fatal, Foghorn's actions, even if they were

non-lethal absent Williams' pre-existing weakness, would still be considered a proximate cause of

Williams' death if they served to substantially hasten the victim's death.  See Oxendine v. State, 528

A.2d at 872-73.

In his memorandum in support of this motion for acquittal, Foghorn urges the Court to reach

the same result as the Supreme Court of Delaware in Oxendine v. State.  The court in Oxendine v.

State held that non-lethal injuries inflicted by a subsequent actor could not be considered the

proximate cause of the victim's death because there was no evidence that the injuries hastened the

victim's death.  See id. at 873.  The Court indicated that neither of the medical experts that testified

for the prosecution were able to offer an opinion as to whether the subsequent injuries accelerated

the victim's death.  See id.  In contrast to the testimony the prosecution in Oxendine v. State offered,

however, the expert testimony in this case was sufficient for a reasonable jury to determine that

Foghorn's actions hastened Williams' death.

Dr. Bisharra testified that repeated injury can accumulate to enhance a victim's injury.  See

July 26 Transcript at 235:23 - 236:2.  Specifically, he stated that repeated injury can cause cerebral

edema.  See id. at 213:5-10.  He testified that it was obvious that being dragged out of Foghorn's

pickup and having his head hit the ground would make Williams' head injury worse.  See id. at

212:11-15.  He noted that, in his opinion, being wet, nude, and being driven in the back of a moving

pickup truck in cold tempatures could amplify symptoms of hypothermia.  See id. at 211:11-24.

Dr. Nine testified that Williams suffered multiple injuries, including jaw fractures, see id. at

267:15-18, various broken bones, see id. at 267:21-25, skull fractures, see id. at 270:12-14, a

subdural hematoma, see id. at 271:6-8, and pattern injuries that appeared consistent with severe whipping by a stick or branch, see id. at 272:2-8.   Although Dr. Nine identified the cause of Williams' death as blunt force injuries to the head and neck, see id. at 286:20-25, he acknowledged that the other injuries Williams suffered could potentially be fatal to a person in a debilitated state. See id. at 293:18-25.

Foghorn's expert, Dr. Seelinger, testified that brain swelling and blunt injury to the brain was the ultimate cause of Williams' death.   See July 27 Transcript at 94:17-20.   He also testified, however, that the amount of alcohol in Williams' system and the hypothermia he developed over the course of the night complicated Williams' injuries.   See id. at 94:24 - 96:3.   Finally, Dr. Seelinger acknowledged that, although he thought it improbable that Williams could have suffered a serious head injury when he was pulled from Foghorn's pickup truck and fell to the ground, Williams did have some scrapes and minor injuries that could be related to this fall.   See id. at 108:14 - 109:10.

None of the three experts could determine in what order Williams suffered his injuries or precisely identify at what point during the night and early morning Williams' condition became fatal. See July 26 Transcript at 217:2-21 (Dr. Bisharra); id. at 291:18-23 (Dr. Nine); July 27 Transcript at 121:21 - 122:1 (Dr. Seelinger).   Dr. Seelinger, however, testified that although he assumed that all of Williams' head injuries were suffered during his initial confrontation with Nez, it was his opinion that, if help had been sought immediately after Williams sustained his original head injuries, Williams would have had a chance of survival.   See July 27 Transcript at 104:9-13.

Based on Foghorn's own testimony, and the testimony of the three experts, and using their own experience as a touchstone, a reasonable jury could have found that the United States proved beyond a reasonable doubt, that Foghorn's actions were a contributory cause of Williams' death.

The extent of the injuries Foghorn inflicted do not need to be as severe as those inflicted by  Nez, or others, for culpability to attach.  See United States v. Woods, 59 Fed. Appx. at 324 ("[W]hen the conduct of two or more persons contributes concurrently as a proximate cause of death, the conduct of each person is a proximate cause, regardless of the extent to which each contributes to the death.").  The extensive injuries exhibited on Williams' body were evidence of the multiple beatings Williams endured.  Foghorn was not only present for the second beating, but, with Nez and Tso, helped remove Williams' clothes, poured beer on him, and performed wrestling moves upon him. The jury could have relied on this evidence to find that Foghorn directly caused Williams' death.

In addition to his affirmative actions, the jury could have reasonably believed that, by preventing Williams from receiving medical care and extending his exposure to the elements, Foghorn, in collaboration with Nez and Tso, exacerbated Williams' injuries and hastened his death. Foghorn's expert, Dr. Seelinger, described the analysis of Williams' condition as a "progressive problem," and noted that Williams chances of survival diminished as time passed throughout the night.  See July 27 Transcript at 121:21 - 122:1.  Dr. Bisharra testified that Williams' deepening hypothermia complicated his cerebral edema, because as his body temperature began to warm in the ambulance and the hospital, his brain functioning deteriorated.  See id. July 26 Transcript at 196:17- 21.  Accordingly, the jury was entitled to find that, had Williams' exposure to the elements been briefer, and his hypothermia less severe, his chances of survival would have been greater and his life would have been extended.

Foghorn contends that "highly relevant, on-point case law authority from other American courts" compel a contrary conclusion on the issue of causation.  See Defendant Daniel Shadowhawk Foghorn's Reply to the Government's Response to his Motion for Judgment of Acquittal at 1, filed

December 27, 2005 (Doc. 222)("Foghorn Reply").  In addition to Oxendine v. State, he cites Terry v. Commonwealth, 198 S.E. 911 (Va. 1938), and Seagroves v. State, 281 S.W.2d 644 (Tenn. 1955), as support for his contention that the evidence presented to the jury was not legally sufficient to establish a causal connection between his actions and Williams' death.  The Court believes, however, that both of these cases can be distinguished from Foghorn's case, and, therefore, do not support his argument.

The defendant in Terry v. Commonwealth, was convicted of involuntary manslaughter.  The defendant, while intoxicated, drove his automobile into the rear end of another vehicle with such force that the vehicle was forced across the intersection where it struck a pedestrian, leaving the pedestrian temporarily unconscious and with a broken leg.  See Terry v. Commonwealth, 198 S.E. at 912.  The pedestrian was treated at a local hospital where he was carefully examined, his leg was re-set, and he was released and resting comfortably.  See id.  The victim's treating physician indicated that he responded to treatment in a normal way and had eaten well after the accident.  See id.  At 10:30 p.m. on the day following the accident, however, the pedestrian was once again hospitalized, diagnosed with acute pulmonary edema of the lungs, and died as a result of the disease the following morning.  See id.

Only one medical expert testified at the trial in Terry v. Commonwealth, a witness the government presented, who testified that it was "equally probable that death was the result of natural causes as it was of the injuries received in the accident."  Id. at 913.  The Supreme Court of Virginia overturned the conviction, reasoning that in light of the limited testimony regarding causation, when the evidence was viewed in the light most favorable to the government, it was "equally probable that the death of the deceased was due to the natural cause of indigestion, as the result of overeating . .

-31-

., as that the death was due to any cause for which the accused could be said to be responsible." Id.

Seagroves v. State is similar to Terry v. Commonwealth. In Seagroves v. State, the Supreme Court of Tennessee overturned the voluntary manslaughter conviction of a defendant who had been in a fistfight with the deceased. The deceased had been immediately hospitalized after the encounter and died six days later. See Seagroves v. State, 281 S.W.2d at 644.

The victim's treating physician testified at trial that he had treated the victim for gastroenteritis, identified the cause of death as circulatory failure, and indicated that the clinical findings suggested that the victim had suffered from acute diarrhea and a stomach condition. See Seagroves v. State, 281 S.W.2d at 644-45. In overturning the conviction, the Supreme Court of Tennessee pointed out that "[n]owhere does it appear from the physician's testimony that deceased [sic] died from the blows inflicted by the defendant," and that, based on all the other evidence presented at trial, "we do not have a case here where the wounds are so manifest that the court could reasonably conclude that these wounds produced the death of the deceased." Id. at 645, 646. The court in Seagroves v. State summarized that, when it is "equally probable that death resulted from one cause as from another, and the defendant is not responsible for one of the causes, then any determination of the cause of death cannot be speculative and conjectural, and the evidence will be held insufficient to support a verdict of guilty." See id. at 645.

There are several differences between Terry v. Commonwealth, Seagroves v. State, and Foghorn's case. First, three medical experts testified in Foghorn's trial, each acknowledging that Williams suffered multiple injuries in addition to the severe head injuries that Nez caused. Foghorn's expert, Dr. Seelinger, testified that Williams' condition was not necessarily fatal immediately after he sustained his original injuries. See July 27 Transcript at 104:9-13. Second,

-32-

although Dr. Seelinger testified that the cause of death was brain swelling and blunt injury to the brain, he also agreed that Williams' hypothermia, a condition to which the jury could rationally have found Foghorn contributed, complicated the injuries. Third, unlike in the cases Foghorn cites, where the defendants' actions and the victims' deaths were separated by two and six days, the temporal proximity between Foghorn's actions and Williams' death supports a causal connection. Finally, in both <u>Terry v. Commonwealth</u> and <u>Seagroves v. State</u>, there was some evidence that the victim may have died of natural causes; no such evidence exists in this case. The state courts overturned the defendants' convictions because the evidence presented at trial was sparse and equivocal, and therefore could not substantiate a conviction beyond a reasonable doubt as a matter of law. The evidence in this case is more substantial, and when viewed in the light most favorable to the government, reasonably capable of sustaining a finding that Foghorn caused Williams' death beyond a reasonable doubt.

The United States is not required to prove that Foghorn physically struck the fatal blow to satisfy the causation element of second-degree murder. Foghorn contends that "it is incontrovertible that Mr. Nez inflicted the severe and fatal blows to Mr. Williams' head and neck during his solo fight with Mr. Williams." Motion for Acquittal at 1. This assertion does not reflect the evidence that the jury heard nor does it properly characterize all the evidence presented in the light most favorable to the United States. Indeed, Foghorn's expert, Dr. Seelinger, testified that if help had been sought immediately after Williams sustained his original head injuries, Williams would have had a chance of survival. <u>See</u> July 27 Transcript at 104:9-13.

Foghorn urges the Court to disregard some of the evidence that the jury had available to make its determination. Given the standard that the Court must employ to decide a motion for acquittal,

Foghorn's heavy reliance on Dr. Seelinger is misplaced, because Dr. Seelinger bases his testimony on an assumptive timeline that the jury was free to discount or ignore.  In addition, although Dr. Seelinger premises his opinion on the most serious injuries being inflicted upon Williams between 1:15 a.m. and 1:30 a.m., before Foghorn became involved in the murder, and points out that Williams' chances of survival would have significantly decreased between 1:30 a.m. and 3:30 a.m., the time at which he assumes Foghorn came into contact with Williams, he cannot entirely rule out the possibility of Williams' survival at this later time.  Because Williams was alive when Foghorn encountered him, the jury could have decided that Foghorn's conduct extended the time Williams was deprived of medical care, deepening his hypothermia and complicating his other injuries, thereby constituting a direct cause of death or hastening his death.

### 2.    **Duty to Rescue.**

Foghorn is correct that he cannot acquire criminal liability simply by being present at the scene of the crime, or even by being at the scene knowing that a crime was taking place.  Foghorn argues, however, that it was Nez, and not himself, who placed Williams in a position of danger.  See Motion for Acquittal at 16.  He argues that, in the context of this case, "[t]he position of danger . . . would be lying on the ground, severely beaten at Turtle Rock on a cold night."  Id.  The Court does not believe that the jury was obligated to construe Williams' danger, or Foghorn's duty, so restrictively.

Foghorn was not a passive actor after encountering Williams at Turtle Rock.  When he approached a seriously injured Williams, a victim he understood to already be in need of medical assistance, and proceeded to beat, strip, and cover him in liquid, he placed Williams in a situation of amplifed danger and created for himself a duty to rescue Williams.  See United States v. Hatatley,

130 F.3d at 1406 ("[W]hen a person places another in danger, fails to safeguard or rescue him and he dies, such omission is sufficient to support criminal liability.").

Among other evidence, the jury was free to consider Dr. Bisharra's testimony that the subsequent beatings and continued exposure to the elements constituted repeated traumas that enhanced Williams' peril. See July 26 Transcript at 211:11-24; 235:23 - 236:2. There was evidence that Foghorn was an active participant in creating Williams' ultimate condition; he cannot avoid incurring liability of his own simply because the victim was already injured when he came upon him.

Foghorn's expert, Dr. Seelinger, admitted that, while Williams' chances of survival would have diminished over the course of the evening, because of the nature of his initial injuries, and because of his continued exposure to the elements, some degree of rescue was still potentially possible at the time Foghorn came upon Williams. See July 27 Transcript at 107:9-13. Rather than facilitate assistance, however, Foghorn engaged in brutal behavior that a reasonable jury could have determined exacerbated Williams' condition and shortened his life.

The Court does not believe that Williams' condition at Turtle Rock was the only position of danger in which Williams was placed on October 25, 2003. First, Dr. Bisharra testified that putting Williams in the back of an open pickup truck would have been likely to contribute to Williams' injuries. Specifically, Dr. Bisharra noted that driving in an open pickup truck "would definitely contribute to the hyperthermia . . . especially if [the individual was] in wet clothing or no clothing." July 26 Transcript at 211:17-19. Dr. Bisharra added that "[t]he process of raising someone up onto a truck can aggravate certain types of injuries, like neck injuries and . . . possibly facial injuries, [and] cause more bleeding . . . unless it's done by someone who knows how to do it." See id. at 211:20-24.

-35-

Second, after participating in the second beating of Williams, Foghorn was a principal actor in the abandonment of Williams by the side of a sparsely traveled country road. <u>See</u> <u>id.</u> at 135:11 - 137:14 (Walter).  Knowing Williams was unable to protect himself, Foghorn, along with Nez and Tso, physically placed Williams on the ground, in the dark, next to a road where he knew there to be some traffic.  <u>See id.</u> at 314:7 - 316:5 (Foghorn).  Indeed, Foghorn testified that he suggested that Williams' be left where he was precisely <u>because</u> there would be traffic.  <u>See id.</u> at 310:12-15.

Foghorn admits that Williams was still alive and cognizant at this point in the evening.  <u>See</u> <u>id.</u> at 314:20-23 (stating that when he pulled Williams out of the pickup truck, Williams reached down to catch himself rather than to allow his head to hit the ground).  The evidence shows that, even later in the morning, Williams was able to communicate his name to Smiley upon her arrival at the scene beside the road.  <u>See</u> July 25 Transcript at 115:24 - 116:2 (Smiley).  Despite Foghorn's characterization of these events as "efforts to bring Mr. Williams closer to being rescued," <u>see</u> Motion for Acquittal at 16, under these facts, a rational jury could have found Foghorn placed Williams in a position of danger, and then did nothing to "safeguard or rescue him."  <u>United States</u> <u>v. Hatatley</u>, 130 F.3d at 1406.  Viewing all of the evidence presented to the jury in the light most favorable to the verdict, a reasonable jury could choose to hold Foghorn criminally liable for his failure to assist Williams.

### 3. <u>Aiding and Abetting.</u>

To prove that Foghorn aided and abetted the second-degree murder of Williams, the United States was required to establish: (i) that Foghorn associated himself with the second-degree murder of Williams; (ii) that he participated in the murder as something he wished to bring about; (iii) that he sought by his actions to succeed in murdering Williams; and (iv) that someone succeeded in

-36-

committing the second-degree murder of Williams with Foghorn's assistance.  See United States v. Sarracino, 131 F.3d at 946.

It may be that the requirement that Foghorn "participated in the murder" requires the same causation analysis that guilt as a primary requires.  In any case, because the Court has already concluded that the United States presented evidence sufficient to find Foghorn guilty of second-degree murder as a principal, the Court finds that the jury was within its duties in finding that Foghorn associated with Nez and Tso, and participated in the killing of Williams.  Further, the Court believes that the jury could have reasonably construed his actions as reflecting a wanton disregard for Williams' life, constituting proof that Foghorn possessed the requisite criminal intent for second-degree murder, malice aforethought, and that he desired to achieve the objective of the crime. Foghorn's attempt to incorporate into his defense a deadline or time by which Foghorn had to join the criminal enterprise is not determinative.  If the jury found that he took an affirmative, participatory act with the intent of accomplishing the murder objective, his participation need be of no more than of "relatively slight moment."  United States v. Isaac-Sigala, 448 F.3d at 1210.  A reasonable jury could have found that Foghorn participated in the crime, and aided and abetted Nez and Tso, by exacerbating Williams' injuries and taking actions that could reasonably be construed to hasten Williams' death.

Foghorn, in his interviews with the FBI, and at trial, provided questioners with multiple versions of his involvement in the beating death of Williams. In weighing the evidence presented at trial, the jury was free to reject any of Foghorn's assertions and evaluate evidence it considered more reliable.  Statements by other witnesses, including Nez and the parties' various experts, were subject to the same standard of acceptance or rejection.  The jury was not required, however, to

determine who wielded particular weapons or who was responsible for specific injuries that Williams suffered that morning.

The jury was free to consider all of the direct and circumstantial evidence before it, as well as draw any reasonable inferences derived from that evidence.  In light of the inconsistencies in Foghorn's own accounts of the events, his admissions in interviews with the FBI and at trial regarding his participation in the second beating and abandonment of Williams, and the expert testimony presented at trial, there is sufficient evidence to find that, when the jury convicted Foghorn on the evidence before it, they acted reasonably.

A reasonable jury could determine on these facts that Foghorn was guilty of second-degree murder beyond a reasonable doubt, either as a principal or on an aiding and abetting theory.  The Court will deny Foghorn's Motion for Acquittal on Count I.

## II.    A REASONABLE JURY COULD HAVE FOUND FOGHORN GUILTY BEYOND A REASONABLE DOUBT OF KIDNAPING BUT NOT KIDNAPING RESULTING IN DEATH.

At trial, the jury was instructed that, to prove Foghorn guilty of kidnaping, the United States was required to establish: (i) that Foghorn, along with Tso and Nez, kidnaped, seized, or confined Williams; (ii) that he was held for some purpose or benefit; (iii) that Foghorn is an Indian; and (iv) that the crime occurred in Indian Country.  See Jury Instructions, Instruction No. 17, at 18; 18 U.S.C. § 1201; Tenth Circuit Criminal Pattern Jury Instruction 2.55, at 188-89 (2005).  The Tenth Circuit's Criminal Pattern Jury Instruction Committee has noted that, when the indictment alleges that a kidnaping resulted in death and the United States seeks the death penalty, Apprendi v. New Jersey, 530 U.S. 466 (2000), requires the Court to charge an additional element.  See Tenth Circuit Criminal Pattern Jury Instruction 2.55 cmt., at 189.  The Court believes that the Tenth Circuit would also

require this additional element whenever the United States does not seek the death penalty, but alleges that "the death of any person results."

Foghorn stipulated that he is an Indian and that the crime occurred in Indian Country. The Court should not set aside the conviction where the jury rationally could find the essential elements beyond a reasonable doubt. The problem here, however, is whether the Court can sustain a conviction for a crime for which it did not charge an essential element.

### A.   THE EVIDENCE PRESENTED AT TRIAL THAT THE KIDNAPING OF WILLIAMS SERVED A PURPOSE WAS SUFFICIENT FOR THE JURY TO FIND FOGHORN GUILTY OF KIDNAPING.

Foghorn contends that the evidence which the United States presented against him was insufficient to sustain the guilty verdict of kidnaping. Specifically, he argues that the testimony of the United States' witnesses failed to establish beyond a reasonable doubt that Foghorn, along with Nez and Tso, kidnaped Williams for some purpose or benefit. See 18 U.S.C. § 1201(a).

Foghorn argues that the seizure and transport of Williams was not for the captors' benefit, but to provide Williams assistance in being rescued. The Court believes that providing Williams assistance so that he could be rescued is a "purpose" that could have benefitted Foghorn and, if successful, prevented a murder charge, another benefit to him. Even if not, however, Foghorn's analysis neglects essential evidence in the record. The jury heard the testimony related to this argument, the attorneys' arguments, and all the other evidence, and may have rejected Foghorn's explanation. The jury reasonably could have discounted Foghorn's explanation as self-serving and not believable. The jury may have accepted the United States' argument that, by removing the victim from the crime scene, Foghorn furthered his goal of not getting caught and further exercising control over Williams.

In United States v. Sarracino, the Tenth Circuit stated that "[m]oving a victim to continue a beating in a more secluded location and to prevent detection satisfies the statute." United States v. Sarracino, 131 F.3d at 947. Foghorn cites that quoted language to the Court and argues that, because, unlike the kidnapers in United States v. Sarracino, Foghorn and his companions moved Williams from a more remote location to a less remote location, the purpose of the kidnaping statute is not met. See Foghorn Reply at 6. The holding of United States v. Sarracino should not be so narrowly construed. Foghorn fails to note that the Tenth Circuit went on to say that all that is necessary is "that the kidnappers had some reason for the kidnapping which, to them, would be of some benefit." United States v. Sarracino, 131 F.3d at 947. The Tenth Circuit concluded that the captors' mere desire to continue beating the victim would have been enough to satisfy the statute. See id. Moreover, interpreting United States v. Sarracino in this manner more accurately reflects the liberal interpretation of the benefit requirement established in Gooch v. United States, 297 U.S. 124. In Gooch v. United States, the Supreme Court held that "any benefit which a captor might attempt to receive for himself" will satisfy the purpose element of the kidnaping statute. United States v. Walker, 137 F.3d at 1219.

Because Williams was still alive when Keith discovered him by the side of the road in the early morning, there is evidence that, during the time of the kidnaping, Williams was alive and being abused. There is also evidence that, ultimately, he was forcefully removed and transported to a location against his will– a remote location on the Navajo Indian Reservation. Finally, in addition to Foghorn's self-serving declarations that Williams was moved to the road near the Two Gray Hills Trading Post, there was contrary testimony, which the jury was entitled to believe, that Foghorn chose the particular drop-off location because he did not have enough gasoline in his truck to take

him to a more preferable location further away.  See July 26 Transcript at 310:6-10.

There was evidence from which a reasonable jury could infer that the transportation occurred for the purpose of removing Williams from the scene of the initial attacks and to allow Foghorn, Nez, and Tso to retain dominion over him.  Even if Foghorn's explanation is to believed, however, the jury could have inferred that Foghorn and his co-defendants motivation for procuring assistance for Williams was to avoid being held responsible for their brutal acts.  Each of these purposes satisfies the benefit requirement the Tenth Circuit applies in kidnaping cases.  See United States v. Gabaldon, 389 F.3d at 1096 (describing kidnaping statute's benefit requirement as "very lax").

In the view of the jury, Foghorn's testimony that the transport of Williams was an attempt to assist him could reasonably have been outweighed by the lack of evidence that he actually rendered assistance to the dying Williams.  He admitted he participated in the second beating of Williams, stripped him, drove him half dressed in the exposed bed of his pickup truck, and eventually abandoned him on the side of the road.  Foghorn further admitted that, subsequent to removing Williams from the truck, he attempted to clean Williams' blood from the truck bed, did not call for emergency medical assistance, and did not immediately tell anyone of Williams' need for help.  Rather than find that these actions were for Williams' benefit, a rational juror could have weighed this evidence and determined that these actions were taken to make the crime harder to trace, avoid detection, or to mitigate Foghorn's culpability.

Foghorn's argument has problems.  To succeed, the Court must ignore significant portions of the trial record and accept his self-serving statements.  The Court believes that to approach the evidence in such a fashion would require it not to view the facts in the light most favorable to the jury's verdict.

-41-

Based on the evidence before the jury, the Court concludes that a rational jury could find Foghorn guilty of kidnaping beyond a reasonable doubt. Although Foghorn expended considerable effort in attempting to persuade the jury that it should believe his sole purpose in kidnaping Williams was to assist him, it was the jury's prerogative to accept the testimony as truthful or not. The jury is permitted to attach to the evidence the weight to which it determines it is entitled. In the end, Foghorn does not present a sufficiency issue for the Court's resolution once the facts in evidence are compared with the statutory requirements that must be met for a rational jury to convict him of the crime of kidnaping.

**B.      THE JURY WAS NOT CHARGED WITH RESPECT TO THE "IF THE DEATH OF ANY PERSON RESULTS" ELEMENT OF KIDNAPING RESULTING IN DEATH AND THEREFORE THE CONVICTION FOR THAT CRIME CANNOT STAND.**

In his motion, Foghorn appears to challenge the jury's kidnaping finding on causation grounds similar to those he raised in his argument related to the second-degree murder conviction. Foghorn argues that the kidnaping conviction cannot stand because of the "lack of a causal connection between Mr. Foghorn's conduct and Mr. William's death." Motion for Acquittal at 21. Foghorn contends that "there was no evidence from which a juror could rationally conclude that the Government proved beyond a reasonable doubt that the fall from the pickup truck to the ground caused Mr. Williams' death." Id.

Although the United States' Second Superceding Indictment contains a sentencing allegation that the kidnaping alleged in this case resulted in death, see Second Superceding Indictment at 2, neither Foghorn's proposed kidnaping instruction, see Defendant's Proposed Jury Instructions, Defendant's Requested Jury Instruction No. 9, at 13, filed July 15, 2005 (Doc. 178), nor the Court's

given kidnaping instruction, see Jury Instruction, Instruction No. 17, instructed the jury that it must

find beyond a reasonable doubt a causal connection between an unlawful seizure and detention and

death as an element of a kidnaping resulting in death conviction.  The United States did not submit

a kidnaping instruction at the second trial, nor object to the Court's instruction.[4]  The Court's given

instructions,  however, included the United States Second Superceding Indictment, which indicated

that Foghorn was charged with kidnaping resulting in death.  See Jury Instructions, Instruction No.

12, at 14.

In Foghorn's first trial, the United States submitted a proposed instruction that contained a

causation element, and Foghorn submitted an instruction that quoted the Tenth Circuit Pattern Jury

Instruction Committee's comment to its kidnaping instruction, noting that Apprendi v. New Jersey

requires the court to charge an additional element when the United States alleges that a kidnaping

resulted in death and seeks the death penalty.  See United States Requested Jury Instructions,

Government's Requested 8, at 19; Defendant's First Proposed Jury Instructions at 20-21.  The

Court's kidnaping instruction in Foghorn's first trial, however, also did not charge the jury with the

task of finding that any kidnaping was the proximate cause of Williams' death.  See Court's Final

Set of Jury Instructions w/Citations, Instruction No. 20, at 26, filed October 27, 2004 (Doc. 118).

Neither the United States nor Foghorn made any objection to the lack of this element in the

instructions at the first trial.  Similarly, at Foghorn's second trial, neither the United States nor

Foghorn made any request that a direction regarding proximate causation be  included in the Court's

---

[4]Foghorn did make one objection to the Court's kidnaping instruction at the second trial, but it did not relate to the jury's obligation to make a causation finding in a kidnaping resulting in death charge.  Foghorn argued that a finding that he knowingly violated the law was an essential element of a kidnaping instruction and that the Court should instruct the jury as to this element.  See July 25 Transcript at 47:2-9.

kidnaping instruction.

In his motion for acquittal, Foghorn states that, "[f]or the purposes of this motion, Mr. Foghorn assumes that the jury read Instruction No. 12 and Instruction No. 17 in pari materia and understood that the Government was required to prove beyond a reasonable doubt that the kidnaping resulted in Mr. Williams's death."  Motion for Acquittal at 20 n.1.  Foghorn argues, however, that if the omission of any causation requirement in the kidnaping instruction "improperly relieved the Government of the burden to prove beyond a reasonable doubt that the kidnaping resulted in Mr Williams's death, then . . . judgment of acquittal is mandated under the holdings and rational of Apprendi [v. New Jersey, 530 U.S. 466 (2000)], Blakely [v. Washington, 542 U.S. 296 (2004)], and [United States v.] Booker[, 543 U.S. 220 (2005),] and their progeny."  Id.

The Court has considered Foghorn's concerns regarding the instructions.  The Court also acknowledges that the commentary to the Tenth Circuit Pattern Jury Instructions recognizes causation as an additional element when the United States alleges that a kidnaping resulted in death and seeks the death penalty.  See Tenth Circuit Criminal Pattern Jury Instruction 2.55 cmt., at 189. In addition, the Court finds the United States District Court for the Southern District of Ohio's holding in United States v. Mayhew, that when the government invokes the sentence-enhancing language in its indictment, it is required to prove proximate causation, to be persuasive.  See United States v. Mayhew, 380 F. Supp. 2d at 958.  The Court believes that holding accurately reflects how numerous other courts, including the Tenth Circuit, have applied the law when interpreting other statutes with comparable sentence-enhancing language.  See United States v. Woodlee, 136 F.3d at 1405.

Because the Court's instructions to the jury did not require them to find that any kidnaping

resulted in Williams' death, the Court finds that the jury was not charged with all the elements of kidnaping resulting in death. Accordingly, the jury could not have returned a conviction on the charge of kidnaping resulting in death. Although the Court assumes that the jury was cognizant of all the jury instructions in pari materia, see Reed v. Landstar Ligon, Inc., 314 F.3d 447, 454 (10th Cir. 2002)("We presume the jury followed the district court's instructions."), it cannot assume that the jury found beyond a reasonable doubt an essential element of the crime when it was not charged with that element. If the United States wanted a conviction for kidnaping resulting in death, a more appropriate course would have been to include a direction regarding causation for kidnaping resulting in death in the kidnaping instruction, and to explain to the jury that they could have found Foghorn guilty of kidnaping as a lesser included offense. See Tenth Circuit Criminal Pattern Jury Instruction 2.55 cmt. at 189.

Like the instructions, the jury's verdict form did not mention kidnaping resulting in death, but rather directed the jury to find Foghorn guilty or not guilty of "kidnapping as charged in Count II of the indictment." Verdict. The United States' Second Superceding Indictment was included as Instruction No. 12. See Jury Instruction, Instruction No. 12, at 13. The Second Superceding Indictment, however, does not direct the jury that they must make a finding related to causation. Rather, it charges that Foghorn kidnaped Williams and makes a conclusory allegation that the kidnaping resulted in Williams' death. See id. Moreover, the jury was also instructed that the Second Superceding Indictment was only the formal charge against Foghorn and was not evidence of his guilt. See id., Instruction No. 11, at 12. Viewing the instructions as a whole, the Court believes that the jury was instructed on the elements of kidnaping, not kidnaping resulting in death, and returned a verdict of guilty on the former only.

The Court believes it is within its power to "direct the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense." Rutledge v. United States, 517 U.S. 292, 306 (1996). The Supreme Court has noted the use of this practice with approval so long as the defendant is unable to prove that, but for the erroneous charge, "the result of the proceeding probably would have been different." Morris v. Mathews, 475 U.S. 237, 247 (1986). See Williams v. Snider, No. 98-6432, 1999 U.S. App. LEXIS 13232, **6-7 (10th Cir. June 15, 1999)(quoting Rutledge v. United States and Morris v. Matthews in approving the Oklahoma Court of Criminal Appeals' decision to reduce a defendant's conviction to the lesser included offense of robbery in the first degree, rather than order a new trial, when the court found the evidence was insufficient to support a conviction of robbery with a firearm)(unpublished opinion). This finding is consistent with rule 31(c)(1) of the Federal Rules of Criminal Procedure and the Supreme Court's general jurisprudence on lesser included offenses. See Fed. R. Crim. P. 31(c)(1) ("A defendant may be found guilty of . . . an offense necessarily included in the offense charged."); Keeble v. United States, 412 U.S. 205, 208 (1973)("[I]t is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.").

Because proximate causation is not an element of a kidnaping conviction, the Court does not need to address Foghorn's causation arguments. The Court has already determined that there is sufficient evidence for a reasonable jury to find Foghorn guilty of kidnaping beyond a reasonable doubt. The jury was not charged with determining whether Foghorn was guilty of kidnaping resulting in death, however, and therefore he cannot be found guilty of that crime.

### III.     JUROR SMITH IS INCOMPETENT TO PROVIDE MOST, IF NOT ALL, OF THE TESTIMONY SHE SEEKS TO PRESENT.

Foghorn contends that racial animus improperly infected the jury's deliberative process, and therefore the jury's verdict is not in accordance with the law.  Foghorn notes that a mistrial is the typical remedy where juror bias has prejudiced a defendant to the point that he has not received a fair trial, and attempts to bring the affidavit of Amy J. Smith, a juror, to the Court's attention "to highlight the shaky ground upon which the jury's verdict rests."  Motion for Acquittal at 24. Foghorn also notes the "exceptionally brief time period" in which the jury deliberated in reaching a verdict.  See id.  Foghorn argues that these factors compel the Court to enter a judgment of acquittal, or in the alternative, to declare a mistrial because of "racial prejudice infecting the integrity of the jury's deliberations."  Id. at 25.

Foghorn's efforts to have the Court consider internal juror discussions by juror affidavit is, to a significant extent, not appropriate, and his efforts to raise other jury procedural deficiencies by innuendo is improper.  Rule 606(b) forbids admission of Smith's statements regarding any statements made, or actions that occurred, during the jury's deliberation or anything that might have influenced the jury or individual jurors during the deliberative process.  The Court will not consider the affidavit to the extent it seeks to generally question the jury's verdict, deliberations, jurors' moods or emotions, or jurors' mental processes because the proffered testimony is inappropriate and inadmissible for those purposes.  Similarly, the brevity of the jury's deliberation, cannot be used to attack the verdict.  See United States v. Lawrence, 405 F.3d 888, 905 n.11 (10th Cir. 2005)("While the amount of time spent in deliberations might provide some indication of whether the jury reached its conclusion with ease or struggled to agree on a verdict, it seems doubtful that the duration of jury

deliberations could ever provide certain guidance on the question of whether jurors were biased against the defendant.").

Foghorn attempts to inject racial bias as a method to attack the jury's verdict.  He points to Smith's allegation that, while the jurors were deliberating after the close of evidence, one of the jurors remarked "those poor Indians and their alcohol."  Smith Affidavit ¶ 7, at 2.  Foghorn contends that the Court should consider this statement because it fits within rule 606(b)'s narrow exception allowing a juror to testify as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."  Fed. R. Evid. 606(b).  Foghorn cites United States v. Davis, 1 F.3d 1014 (10th Cir. 1993), as a case in which, in light of evidence of juror bias based on impermissible racial grounds, a conviction was invalidated.  Foghorn suggests that the Tenth Circuit in United States v. Davis cited with approval the United States Court of Appeals for the Eleventh Circuit's decision in United States v. Heller, 738 F.2d 1524 (11th Cir. 1986), a case in which a mistrial was declared based on allegations of jurors' racial bias.

Neither United States v. Davis nor United States v. Heller, however, stand for the proposition that juror statements regarding alleged racial bias are admissible evidence under rule 606(b) after a verdict has been entered.  In United States v. Heller, the jury forewoman sent the district court judge a note referencing racial slurs used by jurors during deliberations.  The Court then performed voir dire of each juror and assessed their ability to be impartial before a verdict was entered.  The district court, satisfied with the juror's promises of impartiality, denied the defendant's motions for a mistrial and the jury subsequently entered a guilty verdict.  In reversing the district court's denial of the mistrial motions, however, the Eleventh Circuit disagreed with the district court's bias findings;

-48-

it did not address the admissibility of juror statements or whether it was permissible for the Court

to consider juror statements under rule 606(b).  See United States v. Heller, 738 F.2d at 1527-29.

The parties have not cited, and the Court has not found, any Tenth Circuit authority

conclusively addressing whether a court may consider post-verdict evidence of racial bias in

harmony with rule 606(b).  See Brown v. Gibson, 7 Fed. Appx. at 908-09.  A review of the law in

other circuits is equally inconclusive.  Compare United States v. Henley, 238 F.3d at 1120

(suggesting that "a powerful case can be made that Rule 606(b)['s prohibition against juror

testimony] is wholly inapplicable to racial bias"), with Williams v. Price, 343 F.3d at 239 (describing

consideration of post-verdict evidence related to racial bias as "problematic").  The Court also notes

that at least two current Justices of the Supreme Court, Justice Thomas in his concurring opinion in

Georgia v. McCollum, and Justice Alito while on the United States Court of Appeals for the Third

Circuit in Williams v. Price, have recognized the tension inherent between consideration of jurors'

racially biased statements and the policy justifications that support rule 606(b) and that the Supreme

Court endorsed in Tanner v. United States, 483 U.S. at 117-27.

Foghorn, in his motion, cites the United States Court of Appeals for the Ninth Circuit's

decision in United States v. Henley, and argues that the reasoning in that case exempts evidence of

racial prejudice from Rule 606(b)'s juror incompetency doctrine.  Motion for Acquittal at 23.  The

facts in United States v. Henley, however, involved a juror who had been asked direct questions

about racial bias during voir dire, and who had sworn that racial bias would not be a factor in his

deliberations.  See United States v. Henley, 238 F.3d at 1121.  Under these circumstances, the Ninth

Circuit determined that evidence of the juror's alleged racial bias was admissible, not under rule

606(b),  but for the purposes of determining whether the juror's responses during voir dire were

-49-

truthful.  See id.   The Ninth Circuit admitted that, while it was persuaded by "cases that have exempted evidence of racial prejudice from Rule 606(b)'s juror incompetency doctrine, we need not decide today whether or to what extent the rule prohibits juror testimony concerning racist statements made during deliberations or, as in this case, outside of deliberations but during the course of the trial."  Id.

Moreover, the Court does not believe that it needs to decide whether it may consider the potentially biased statement that Smith invokes, because Foghorn has not made a showing sufficient to justify the Court investigating further.  The Court should hesitate before "haul[ing] jurors in . . . to probe for potential instances of bias, misconduct, or extraneous influences."  United States v. Connolly, 341 F.3d at 34.  The Tenth Circuit, in United States v. Davis, noted that more than mere conjecture, but actual evidence of racial bias, is necessary for a court to make an inquiry into allegations of bias and that a court should "presume that jurors remain true to their oath and observe the instructions of the court absent evidence to the contrary."  United States v. Davis, 1 F.3d at 1016. Post-trial investigations are not an opportunity for a convicted defendant to conduct a "fishing expedition," but are appropriate only where "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant."  United States v. Moon, 718 F.2d at 1234 (internal citation omitted).

In Brown v. Gibson, the Tenth Circuit considered a post-verdict affidavit that a black juror made in which the juror stated that he violated his oath by voting for a first degree murder conviction, in which he did not believe, in order to accommodate other jurors and to appease the white jurors, even though he believed the case was one of self-defense. See Brown v. Gibson, 7 Fed. Appx. at 908.  Citing Tanner v. United States, 483 U.S. at 117, the Tenth Circuit stated that "[i]t is

settled that a single juror may not impeach a jury's verdict." Brown v. Gibson, 7 Fed. Appx. at 908.

As grounds for its decision, the Tenth Circuit stated:

> Assuming without deciding that we may consider [the juror's] affidavit, we conclude the affidavit does not compel reversal. It makes nonspecific allegations. Also, [the juror] does not indicate why he did not bring evidence of alleged racial pressures to the trial court's attention before the jury reached its verdicts. We refuse to allow this allegation, raised long after the verdicts, to disrupt the finality of the trial.

Id. at 908-09.

The statement that Smith alleges another juror made, "these poor Indians and their alcohol," is analogous to the juror statement that the Tenth Circuit dismissed in Brown v. Gibson. On its face, the statement is ambiguous and subject to interpretation. Just as easily as the statement could be capable of "inflaming . . . racial prejudice against Indians," Motion for Acquittal at 25, it could also be interpreted as an expression of sympathy. The statement does not include any specific allegations of racial prejudice or describe how racial issues, specifically, pressured particular jurors or impacted the jury's ultimate decision in Foghorn's second trial. Smith does not explain why she did not bring her concerns regarding racial animus to the Court's attention at the time the jury issued its verdict. The jury issued its verdict on July 27, 2005, but Smith did not give her affidavit until August 20, 2005. The Court does not believe that this statement alone justifies setting aside the verdict.

The next question is whether Smith's affidavit justifies further inquiry. The Court notes, first, that Foghorn does not specify precisely what he wants the Court to do. In support of his request that the Court conduct further investigation into juror bias, however, Foghorn cites United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir. 1986), for the proposition that "ordinarily the Court should 'undertake an adequate inquiry into the questions of whether the bias actually existed and whether it was prejudicial.'" Motion for Acquittal at 23 (quoting United States v. Bradshaw, 787

F.2d at 1390 (internal quotation omitted)).  The Tenth Circuit in United States v. Bradshaw, however, affirmed the district court, which, after being informed early on in the proceedings of an acquaintance between a particular juror and a government witness, communicated to the parties that it would not conduct further investigation into potential bias unless either party could present specific information amounting to more than "unverified conjecture."  United States v. Bradshaw, 787 F.2d at 1390-91. Accordingly, Foghorn's use of United States v. Bradshaw misunderstands the Tenth Circuit's holding in that case.

First, United States v. Bradshaw is not controlling because it does not involve allegations of racial bias and, more important, it does not involve post-verdict evidence from jurors.  Thus, it does not consider a court's duty to analyze potential juror misconduct in the context of rule 606(b). Second, the Tenth Circuit, in United States v. Bradshaw, did not hold that a court should always make an inquiry into allegations of jury bias, but that a court should make an inquiry "when a party's suggestion that a jury is biased is not frivolous."  See id.

In United States v. Bradshaw, the Tenth Circuit was persuaded by its holding in United States v. Jones, 707 F.2d 1169 (10th Cir. 1983), a case in which the Tenth Circuit affirmed a district court's denial of a request for a mistrial despite evidence that the jury forewoman and the defendant might have known each other some years before the trial.  The district court had conducted an investigation into the matter, but ruled that a mistrial was inappropriate because "[s]omething more than an unverified conjecture is necessary to justify the grant of a new trial where only potentially suspicious circumstances are shown,"and that "even where juror bias is shown, not every incident requires a new trial."  United States v. Jones, 707 F.2d at 1173.

Foghorn has not made a showing sufficient to raise an issue that requires the Court to inquire

further.  Because Foghorn does not allege that alcohol influenced his behavior, and because Foghorn has not shown that these few words had any impact in the case against him, which, when viewed in the light most favorable to the United States, could reasonably be viewed as sufficient evidence of guilt, the Court will not use the proffered affidavit to justify acquittal or as grounds to haul in the jurors for further investigation.  The evidence is nothing more than conjecture, which the Tenth Circuit has acknowledged is not sufficient to mandate an inquiry into jury bias.  The Court finds that an impartial and reasonable jury tried him fairly and convicted him based on sufficient evidence to establish each element of the crimes beyond a reasonable doubt.  Without actual evidence, or more specific allegations, the Court will adopt the reasoning the Tenth Circuit employed in Brown v. Gibson and will not allow Smith's allegation to disrupt the finality of the jury's verdict.

**IT IS ORDERED** that sufficient evidence supports the jury's verdict finding Foghorn guilty beyond a reasonable doubt of second-degree murder.  There is sufficient evidence for a reasonable jury to find Foghorn guilty beyond a reasonable doubt of kidnaping.  Because the jury was not charged with determining whether Foghorn was guilty of kidnaping resulting in death, he cannot be found guilty of that crime.  The Court will not conduct further investigations into allegations of juror bias nor order a mistrial.  The Defendant's Motion for Judgment of Acquittal is denied in part and granted in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the
    District of New Mexico
Paula G. Burnett
Glynette Carson McNabb
  Assistant United States Attorneys
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Arturo B. Nieto
Albuquerque, New Mexico

– and –

D. Penni Adrian
Albuquerque, New Mexico

       *Attorneys for the Defendant*